**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

RUBY BRADLEY and TIMOTHY DEVARGAS, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

THE CREDIT PROS INTERNATIONAL, LLC, a Florida limited liability company,

Defendant.

Case No. 9:26-cv-80734

**CLASS ACTION COMPLAINT**

DEMAND FOR JURY TRIAL

## CLASS ACTION COMPLAINT

Plaintiffs Ruby Bradley and Timothy Devargas ("Plaintiffs"), individually and on behalf of all others similarly situated, and on behalf of the general public, upon personal knowledge of facts pertaining to themselves and upon information and belief as to all other matters, and by and through undersigned counsel, hereby bring this Class Action Complaint against Defendant The Credit Pros International, LLC ("TCP" or "Defendant"), and alleges as follows:

## INTRODUCTION

1. Plaintiffs bring this action on behalf of themselves and all other individuals similarly situated ("Class Members") against TCP for its failure to secure and safeguard the personally identifiable information ("PII" or "Private Information") of Plaintiffs and Class Members.

2. Defendant TCP, a Florida limited liability company, operates as an online credit analysis and restoration service.[1] In the regular course of its business, TCP collects, stores, and maintains the PII of its customers and is required to maintain reasonable and adequate security measures to protect such information from unauthorized access and disclosure.

[1] https://thecreditpros.com/about-us/?utm_content=lm_variation1

3. On or about June 16, 2026, an unauthorized third party gained access to TCP's Salesforce environment and accessed and exfiltrated files containing the PII of its customers and employees (the "Data Breach"). A threat actor using the moniker "Icarus" claimed responsibility for the Data Breach and, on the same day, published a post on the data-leak site Ransomware.live claiming to have stolen the data.

4. TCP owed a duty to Plaintiffs and Class Members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII against unauthorized access and disclosure. TCP breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect customers' PII from unauthorized access and disclosure, or by contracting with companies that failed to do so. Every year, millions of Americans have their most valuable PII stolen and sold online because of data breaches. Despite dire warnings about the severe impact of data breaches on Americans across all economic strata, companies still fail to make the necessary investments in implementing important and adequate security measures to protect their customers' data.

5. TCP required its customers to provide sensitive PII and failed to protect that information. TCP had an obligation to secure customers' PII by implementing reasonable and appropriate data security safeguards. This was part of the bargain between TCP and Plaintiffs and Class Members.

6. As a result of TCP's failure to provide reasonable and adequate data security, Plaintiffs' and the Class Members' unencrypted, non-redacted PII has been exposed to unauthorized third parties. Plaintiff Bradley has already suffered actual misuse of her Private Information, including the appearance on her credit report of accounts she never opened. Plaintiffs' and Class Members' Private Information has been exfiltrated by criminal actors and published on

the dark web. Plaintiffs and the Class are now at much higher risk of identity theft and cybercrimes of all kinds, especially considering the highly sensitive PII stolen here and the fact that the compromised PII is likely already being sold on the dark web. This risk constitutes a concrete injury suffered by Plaintiffs and the Class as they no longer have control over their PII, which PII is now in the hands of third-party cybercriminals. This substantial and imminent risk of identity theft has been recognized by numerous courts as a concrete injury sufficient to establish standing.

7. Plaintiffs and the Class will have to incur costs to pay a third-party credit and identity theft monitoring service for the rest of their lives as a direct result of the Data Breach.

8. Plaintiffs bring this action on behalf of themselves and those similarly situated to seek redress for the lifetime of harm they will now face, including, but not limited to, reimbursement of losses associated with identity theft and fraud, out-of-pocket costs incurred to mitigate the risk of future harm, compensation for time and effort spent responding to the Data Breach, the costs of extending credit monitoring services and identity theft insurance, and injunctive relief requiring TCP to ensure that it implements and maintains reasonable data security practices going forward.

## THE PARTIES

9. Plaintiff Ruby Bradley is a citizen of the State of Nevada, residing in Las Vegas, Nevada, whose PII was compromised as a result of the Data Breach.

10. Plaintiff Timothy Devargas is a citizen of the State of New Mexico, residing in Albuquerque, New Mexico, whose PII was compromised as a result of the Data Breach.

11. Defendant The Credit Pros International, LLC is a limited liability company organized under the laws of the State of Florida, with its principal place of business in West Palm Beach, Florida.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant. For purposes of the Class Action Fairness Act, Defendant is deemed a citizen of both the State in which it has its principal place of business and the State under whose laws it is organized, 28 U.S.C. § 1332(d)(10); The Credit Pros is organized under the laws of Florida and maintains its principal place of business in Florida, while Plaintiffs are citizens of Nevada and New Mexico, respectively, so that minimal diversity is satisfied.

13. This Court has personal jurisdiction over Defendant because it maintains its principal place of business in this District and conducts business in this District and is at home in this State as the entity under whose laws it is organized.

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant has its principal place of business in this District, conducts business in this District, and a substantial part of the events, acts, and omissions giving rise to Plaintiffs' and Class Members' claims occurred in this District.

## GENERAL ALLEGATIONS

15. This is a class action brought by Plaintiffs, individually and on behalf of all citizens who are similarly situated (i.e., the Class Members), seeking to redress TCP's willful and reckless violations of their privacy rights. Plaintiffs and the other Class Members are individuals whose Private Information was collected, maintained, and stored by TCP in connection with the credit analysis, credit repair, and credit restoration services it provides to consumers.

16. On June 16, 2026, an unauthorized third party accessed and obtained Plaintiffs' and

the Class Members' PII.

17. This action pertains to TCP's unauthorized disclosures of Plaintiffs' PII that occurred during the Data Breach.

18. TCP disclosed Plaintiffs' and the other Class Members' PII to unauthorized persons as a direct and/or proximate result of TCP's failure to safeguard and protect their PII.

19. By obtaining, collecting, and storing the PII of Plaintiffs and Class Members, TCP assumed legal and equitable duties and knew or should have known it was responsible for protecting the PII from unauthorized disclosures.

20. Despite recognizing its duty to do so, TCP failed to implement security safeguards to protect Plaintiffs' and the Class Members' PII.

21. Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their PII and relied on TCP to keep their PII confidential and maintained securely, to use this information for business purposes only, to make only authorized disclosures of this information, and to ensure that its third-party vendors and platforms take similar steps.

**A. The Data Breach**

22. On or about June 16, 2026, an unauthorized third party gained access to TCP's Salesforce environment and accessed, copied, and exfiltrated files containing the Private Information of TCP's customers and employees, including full names, contact information, dates of birth, addresses, Social Security numbers, financial account and bank-account numbers, and payment-card numbers, including card verification values (CVVs) and expiration dates. A threat actor using the moniker "Icarus" publicly claimed responsibility and, on or about June 16, 2026, published a post on the data-leak site Ransomware.live stating that it had stolen sensitive employee, customer, and confidential business data from TCP's Salesforce system.

23. According to the threat actor's leak-site post, the exfiltrated data comprised approximately 263 megabytes across multiple files, including a contacts file containing approximately 847,990 records bearing Social Security numbers and a payment-card file containing approximately 722,403 records.

24. As of the date of this Complaint, TCP has not publicly confirmed the Data Breach, has not described the measures taken to remediate the vulnerabilities that led to it, and has not explained the specific measures adopted to prevent future incidents. Upon information and belief, TCP has not provided timely notice of the Data Breach to all affected individuals, and Plaintiffs and Class Members have learned of the compromise of their Private Information through third-party dark-web monitoring services rather than from TCP.

25. TCP's failure to promptly confirm and disclose the Data Breach has left Plaintiffs and Class Members to discover the compromise of their Private Information on their own and to bear the burden of mitigation without TCP's assistance.

**B. Defendant's Data Security Obligations and the Applicable Standard of Care.**

26. The Federal Trade Commission has long advised businesses that reasonable data security includes building security into operations from the outset, employing access controls and strong authentication, conducting network monitoring and segmentation, providing secure remote access, applying timely patches, and implementing secure development practices.[2] The FTC has further explained that reasonable security includes inventorying stored personal information, securely disposing of unneeded data, encrypting sensitive information, understanding system

[2] *See* Fed. Trade Comm'n, *Start with Security: A Guide for Business* (June 2015), https://www.ftc.gov/business-guidance/resources/start-security-guide-business.

vulnerabilities, and planning ahead for breaches.[3]

27. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business,* which established guidelines for fundamental data security principles for business.[4] Among other things, the guidelines note that businesses should properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to address security issues. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[5]

28. Additionally, the FTC recommends that companies limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[6]

29. Highlighting the importance of protecting against phishing and other types of data breaches, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect PII, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders

---

[3] *See* Fed. Trade Comm'n, *Protecting Personal Information: A Guide for Business* (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.

[4] *See* FEDERAL TRADE COMMISSION, *Protecting Personal Information: A Guide for Business* (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

[5] *Id.*

[6] *Id.*

resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

30. The National Institute of Standards and Technology ("NIST") has published a comprehensive catalog of security and privacy controls that establishes objective benchmarks for reasonable security, including controls for access management, incident response, risk assessment, audit logging, authentication, and vendor management.[7] NIST has further published current best-practice guidance on incident response that aligns with the NIST Cybersecurity Framework 2.0.[8]

31. The Center for Internet Security has published the CIS Critical Security Controls, a prioritized and actionable set of safeguards that maps to NIST and other authoritative frameworks and represents the consensus industry best practice for reasonable security.[9]

32. As a financial institution within the meaning of the Gramm-Leach-Bliley Act, 15 U.S.C. § 6801 et seq., TCP was required to comply with the Federal Trade Commission's Standards for Safeguarding Customer Information, 16 C.F.R. Part 314 (the "Safeguards Rule"), which requires financial institutions to develop, implement, and maintain a comprehensive written information security program with reasonable administrative, technical, and physical safeguards appropriate to the sensitivity of the customer information at issue, 16 C.F.R. §§ 314.3, 314.4.[10] Among other things, the Safeguards Rule requires a financial institution to designate a qualified individual to oversee its program, conduct a written risk assessment, implement access controls

[7] *See* Joint Task Force, Nat'l Inst. of Standards & Tech., *Security and Privacy Controls for Information Systems and Organizations*, NIST Special Publication 800-53, Rev. 5 (Sept. 2020), https://doi.org/10.6028/NIST.SP.800-53r5.
[8] *See* Nat'l Inst. of Standards & Tech., *Incident Response Recommendations and Considerations for Cybersecurity Risk Management: A CSF 2.0 Community Profile*, NIST Special Publication 800-61, Rev. 3 (Apr. 2025), https://csrc.nist.gov/pubs/sp/800/61/r3/final.
[9] *See* Ctr. for Internet Sec., *CIS Critical Security Controls* (v8.1) (2024/2025), https://www.cisecurity.org/controls/v8-1.
[10] *See* Fed. Trade Comm'n, FTC Safeguards Rule: What Your Business Needs to Know, https://www.ftc.gov/business-guidance/resources/ftc-safeguards-rule-what-your-business-needs-know.

and encryption of customer information at rest and in transit, implement multi-factor authentication, deploy logging and monitoring sufficient to detect unauthorized access, oversee its service providers, and maintain a written incident response plan.[11]

33. The Federal Trade Commission has repeatedly emphasized that financial institutions must safeguard customer information and has confirmed, through its guidance and enforcement, that the basic safeguards and cyber-preparedness obligations applicable to Defendant are longstanding regulatory expectations rather than novel or emerging duties.[12]

34. The Cybersecurity and Infrastructure Security Agency ("CISA"), in conjunction with the Multi-State Information Sharing and Analysis Center, has published the #StopRansomware Guide, which prescribes basic, well-established measures that organizations are expected to implement to mitigate the threat of ransomware and similar intrusions, including phishing-resistant multi-factor authentication, prompt installation of operating-system and software updates, and ongoing user training.[13]

35. Because Defendant accepted, stored, processed, and transmitted payment-card data (including primary account numbers, card verification values, and expiration dates) Defendant was also subject to the Payment Card Industry Data Security Standard ("PCI DSS"), the information-security standard developed and maintained by the major payment-card networks and administered by the PCI Security Standards Council. PCI DSS prescribes baseline safeguards for any entity that

---

[11] *See* Fed. Trade Comm'n, FTC Strengthens Security Safeguards for Consumer Financial Information Following Widespread Data Breaches (Oct. 27, 2021), https://www.ftc.gov/news-events/news/press-releases/2021/10/ftc-strengthens-security-safeguards-consumer-financial-information-following-widespread-data.

[12] *See* Fed. Trade Comm'n, Financial Institutions and Customer Information: Complying with the Safeguards Rule, https://www.ftc.gov/business-guidance/resources/ftc-safeguards-rule-what-your-business-needs-know.

[13] *See* Cybersecurity & Infrastructure Sec. Agency & Multi-State Info. Sharing & Analysis Ctr., *#StopRansomware Guide* (updated Mar. 2025), https://www.cisa.gov/stopransomware/ransomware-guide.

handles cardholder data, including encryption of cardholder data in transit and at rest, restriction of access to cardholder data on a need-to-know basis, maintenance of secure network configurations, regular testing of security systems and processes, and a prohibition on retaining sensitive authentication data such as card verification values after authorization.[14]

36. By collecting, using, and storing Plaintiffs' and Class Members' Private Information for its commercial benefit, Defendant assumed a duty to implement and maintain reasonable security measures consistent with applicable federal and industry standards. Defendant's duty included, but was not limited to, encrypting Private Information at rest and in transit, implementing multi-factor authentication, deploying logging and monitoring systems sufficient to detect intrusions, maintaining current operating systems and software patches, training its workforce on data security and phishing risks, and implementing reasonable policies and procedures to detect, respond to, and contain security incidents.

**C. The Data Breach was Preventable**

37. The Data Breach was eminently foreseeable. The financial-services sector has long been a leading target of cyberattacks, and Defendant knew, or, in the exercise of reasonable care, should have known, that its systems and the Private Information stored on them were likely targets of cybercriminals.

38. Federal regulators have repeatedly warned financial institutions about the foreseeable risk of cyberattacks. The FTC strengthened the Safeguards Rule, and later added a breach-reporting requirement, specifically because cyberattacks against financial institutions were known to be common, foreseeable, and damaging to consumers.[15] CISA has likewise issued

---

[14] See PCI Sec. Standards Council, Payment Card Industry Data Security Standard: Requirements and Testing Procedures, v4.0.1 (June 2024), https://www.pcisecuritystandards.org/document_library/.

[15] *See* supra note 11.

ongoing public guidance regarding ransomware and similar intrusions.[16]

39. Numerous publicly reported cyberattacks against companies that hold consumers' financial information in the years preceding the Data Breach put Defendant on notice of the foreseeability of the Data Breach and of the categories of Private Information likely to be targeted. Such companies have repeatedly been the subject of high-profile cyberattacks resulting in the compromise of names, Social Security numbers, payment card data, and financial account information in volumes ranging from tens of thousands to tens of millions of records. The financial-services sector's sustained position as one of the most-targeted sectors for cyberattacks is well documented.[17]

40. Had TCP maintained industry-standard safeguards to monitor, assess, and update security controls and related system risks, it could have safeguarded its customers' data. TCP's lack of security controls and the delayed implementation of enhanced security measures only after the Data Breach are inexcusable.

41. TCP was at all times fully aware of its obligation to protect individuals' PII and the risks associated with failing to do so. TCP knew that information of the type collected, maintained, and stored by TCP is highly coveted and a frequent target of hackers.

42. This exposure, along with the fact that the compromised PII is already likely being sold on the dark web, is tremendously problematic. Cybercrime is rising at an alarming rate.

---

[16] *See* supra note 13.

[17] *See* Identity Theft Resource Ctr., 2025 Annual Data Breach Report 9 (Jan. 2026), https://www.idtheftcenter.org/publication/2025-data-breach-report/ (financial services ranked the most-targeted sector in 2025, with 739 compromises).




43. By 2013, it was being reported that nearly one out of four data breach notification recipients become a victim of identity fraud.[18]

44. Stolen PII is often trafficked on the dark web, as is the case here. Law enforcement has difficulty policing the dark web due to this encryption, which allows users and criminals to conceal identities and online activity.

45. When malicious actors infiltrate companies and copy and exfiltrate the PII that those companies store, that stolen information often ends up on the dark web because the malicious actors buy and sell that information for profit.[19]

46. Companies that collect and store consumers' financial information have repeatedly been targeted by cyberattacks and ransomware campaigns in the years preceding the Data Breach, resulting in the compromise of names, Social Security numbers, payment card data, and financial account information in volumes ranging from thousands to millions of records.[20]

---

[18] Al Pascual, *2013 Identity Fraud Report: Data Breaches Becoming a Treasure Trove for Fraudsters*, JAVELIN (Feb. 20, 2013), https://javelinstrategy.com/research/2013-identity-fraud-report-data-breaches-becoming-treasure-trove-fraudsters (last visited June 20, 2025).
[19] *Shining a Light on the Dark Web with Identity Monitoring*, IDENTITYFORCE (Feb. 1, 2020), https://www.identityforce.com/blog/shining-light-dark-web-identity-monitoring.
[20] *See* supra note 16, at 29.

47. These incidents have frequently involved the same categories of Private Information at issue here, and the perpetrators have often published or sold the stolen data on the dark web.[21]

48. The financial-services sector's sustained status as one of the most-targeted sectors for cyberattacks placed TCP on notice of the foreseeability of the Data Breach and of the categories of Private Information likely to be targeted.[22]

49. In April 2020, ZDNet reported in an article titled, "Ransomware mentioned in 1,000+ SEC filings over the past year", that "[r]ransomware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news complaints as revenge against those who refuse to pay."[23]

50. In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[24]

51. Another example is when the U.S. Department of Justice announced its seizure of AlphaBay in 2017. AlphaBay had more than 350,000 listings, many of which concerned stolen

---

[21] *Id.*
[22] *Id.*
[23] Catalin Cimpanu, *Ransomware mentioned in 1000 SEC filings over the past year*, ZDNET (April 30, 2020), https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/.
[24] Multi-State Information Sharing & Analysis Center, *Ransomware Guide*, UNITED STATES CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY (Sept. 2020), https://www.cisa.gov/sites/default/files/2023-01/CISA_MS-ISAC_Ransomware%20Guide_S508C.pdf.

and fraudulent documents that could be used to assume another person's identity. Other marketplaces, similar to the now-defunct AlphaBay, are awash with [PII] belonging to victims from countries all over the world. One of the key challenges of protecting PII online is its pervasiveness. "As data breaches in the news continue to show, PII about employees, individuals, and the public is housed in all kinds of organizations, and the increasing digital transformation of today's businesses only broadens the number of potential sources for hackers to target."[25]

52. The PII of consumers remains highly valuable to criminals, as evidenced by the prices they pay on the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[26] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[27] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[28]

53. Social Security numbers, for example, are among the worst kinds of personal information to have stolen because they can be used for a variety of fraudulent purposes and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud, noting that a dishonest person who has your Social Security number can use it to

---

[25] *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, ARMOR (April 3, 2018), https://web.archive.org/web/20210614051146/https://www.armor.com/resources/blog/stolen-PIIramifications-identity-theft-fraud-dark-web/.

[26] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs,* DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[27] Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/?msockid=2bcba6b07db36c323b77b0a17cc26db2.

[28] *In the Dark*, VPNOVERVIEW, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Sept. 30, 2025).

get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, when they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[29]

54. What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventative action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraudulent activity to obtain a new number.

55. Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[30]

56. Because of this, the information comprised in the Data Breach here is significantly more harmful to lose than the loss of, for example, credit card information in a retailer payment card breach because victims can simply cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

---

[29] *Identity Theft and Your Social Security Number*, SOCIAL SECURITY ADMINISTRATION, Pub. No. 05-10064 (Oct. 2024), https://www.ssa.gov/pubs/EN-05-10064.pdf.

[30] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), https://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

57. The PII compromised by the Data Breach demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10 times on the black market."[31]

58. Once PII is sold, it is often used to gain access to various areas of the victim's digital life, including bank accounts, social media, credit card, and tax details. This can lead to additional PII being harvested from the victim, as well as PII from family, friends, and colleagues of the original victim.

59. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses in 2019, resulting in more than $3.5 billion in losses to individuals and business victims.[32]

60. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

61. Data breaches facilitate identity theft, as hackers obtain consumers' PII and use it to siphon money from existing accounts, open new accounts in their victims' names, or sell consumers' PII to others who do the same.

62. For example, the United States Government Accountability Office noted in a June 2007 report on data breaches (the "GAO Report") that criminals use PII to open financial accounts,

---

[31] Tim Greene, *Anthem hack: Personal data stolen sells for 10x price of stolen credit card numbers*, NETWORK WORLD (Feb. 6, 2015), https://www.networkworld.com/article/935334/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

[32] Fed. Bureau of Investigation, Internet Crime Complaint Ctr., *2019 Internet Crime Report* (2020), https://www.ic3.gov/AnnualReport/Reports/2019_IC3Report.pdf.

receive government benefits, and make purchases and secure credit in a victim's name.[33] The GAO Report further notes that this type of identity fraud is the most harmful because it may take some time for a victim to become aware of the fraud, and can adversely impact the victim's credit rating in the meantime. The GAO Report also states that identity theft victims will face "substantial costs and inconveniences repairing damage to their credit records . . . [and their] good name."[34]

63. The exposure of Plaintiffs' and Class Members' PII to cybercriminals will continue to cause substantial risk of future harm, including identity theft, that is continuing and imminent in light of the many different avenues of fraud and identity theft utilized by third-party cybercriminals to profit off this highly sensitive information.

### D. The Impact of Data Breach on Victims

64. TCP's failure to keep Plaintiffs' and Class Members' PII secure has severe ramifications. Given the highly sensitive nature of the PII stolen in the Data Breach, Social Security numbers, names, dates of birth, payment card information, and financial account information, hackers can commit identity theft, financial fraud, and other identity-related fraud against Plaintiffs and Class Members now and into the indefinite future. As a result, Plaintiffs have suffered injury and face an imminent and substantial risk of further injury, including identity theft and related cybercrimes, due to the Data Breach.

65. The PII exposed in the Data Breach is highly coveted and valuable on underground markets. Identity thieves can use the PII to: (a) commit financial fraud; (b) obtain a fraudulent driver's license or ID card in the victim's name; (c) obtain fraudulent government benefits; (d) file a fraudulent tax return using the victim's information; (e) open new financial accounts and lines

[33] *See* GOVERNMENT ACCOUNTABILITY OFFICE, *Personal Information: Data Breaches are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown*, GAO-07-737 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.
[34] *Id.*

of credit; (f) access financial and investment accounts and records; (g) engage in mortgage fraud; and/or (h) commit any number of other frauds, such as obtaining a job, procuring housing, or giving false information to police during an arrest.

66. Further, malicious actors often wait months or years to use the PII obtained in data breaches, as victims often become complacent and less diligent in monitoring their accounts after a significant period has passed. These bad actors will also reuse stolen PII, meaning individuals can be victims of several cybercrimes stemming from a single data breach.

67. Given the exfiltration of customer PII from TCP, many victims of the Data Breach have likely already suffered significant harm, including, but not limited to, identity theft and fraud. Plaintiffs and Class Members have also spent time, money, and effort dealing with the fallout of the Data Breach, including purchasing credit monitoring services, reviewing financial account statements, checking credit reports, and spending time and effort searching for unauthorized activity.

68. It is no wonder, then, that identity theft exacts a severe emotional toll on its victims. The 2021 Identity Theft Resource Center survey evidences the emotional suffering experienced by victims of identity theft:

- 84% reported anxiety;
- 76% felt violated;
- 32% experienced financial-related identity problems;
- 83% reported being turned down for credit or loans;
- 32% reported problems with family members as a result of the breach;
- 10% reported feeling suicidal.[35]

---

[35]IDENTITY THEFT RESOURCE CENTER, *2021 Consumer Aftermath Report: How Identity Crimes Impact Victims, their Families, Friends, and Workplaces* (2021), https://www.idtheftcenter.org/w

69. Identity theft can also exact a physical toll on its victims. The same survey reported that respondents experienced physical symptoms stemming from their experience with identity theft:

- 48% reported sleep disturbances;
- 37.1% reported an inability to concentrate/lack of focus;
- 28.7% reported they were unable to go to work because of physical symptoms;
- 23.1 reported new physical illnesses (aches and pains, heart palpitations, sweating, stomach issues); and
- 12.6% reported a start or relapse into unhealthy or addictive behaviors.[36]

70. Annual monetary losses from identity theft are in the billions of dollars. According to a Presidential Report on identity theft produced in 2007:

> In addition to the losses that result when identity thieves fraudulently open accounts . . . individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit. Victims of non-financial identity theft, for example, health-related or criminal record fraud, face other types of harm and frustration.
>
> In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts and open new ones, and dispute charges with individual creditors.[37]

71. The unauthorized disclosure of sensitive PII to data thieves also reduces its inherent

---

p-content/uploads/2021/09/ITRC_2021_Consumer_Aftermath_Report.pdf.

[36] *Id.*

[37] The President's Identity Theft Task Force, *Combating Identity Theft: A Strategic Plan* (Apr. 2007), https://www.ftc.gov/sites/default/files/documents/reports/combating-identity-theft-strategic-plan/strategicplan.pdf.

value to its owner, which has been recognized by courts as an independent form of harm.[38]

72. Consumers are injured every time their data is stolen and traded on underground markets, even if they have been victims of previous data breaches. Indeed, the dark web is comprised of multiple discrete repositories of stolen information that can be aggregated together or accessed by different criminal actors who intend to use it for different fraudulent purposes. Each data breach increases the likelihood that a victim's personal information will be exposed to more individuals who are seeking to misuse it at the victim's expense.

73. As a result of the wide variety of injuries that can be traced to the Data Breach, Plaintiffs and Class Members have and will continue to suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

a. The unconsented disclosure of confidential information to a third party;

b. Unauthorized use of their PII without compensation;

c. Losing the value of the explicit and implicit promises of data security;

d. Losing the value of access to their PII permitted by TCP without their permission;

e. Identity theft and fraud resulting from the theft of their PII;

f. Costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

g. Anxiety, emotional distress, and loss of privacy;

h. The present value of ongoing credit monitoring and identity theft protection services necessitated by the Data Breach;

i. Unauthorized charges and loss of use of and access to their accounts;

---

[38] *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—that the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

j. Lowered credit scores resulting from credit inquiries following fraudulent activities;

k. Costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including searching for fraudulent activity, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance, and annoyance of dealing with the repercussions of the Data Breach; and

l. The continued, imminent, and certainly impending injury flowing from potential fraud and identity theft posed by their PII being in the possession of one or more unauthorized third parties.

74. Even in instances where an individual is reimbursed for a financial loss due to identity theft or fraud, that does not make the individual whole again, as seeking reimbursement typically requires significant time and effort. The Department of Justice's Bureau of Justice Statistics found that identity theft victims, "reported spending an average of about 7 hours clearing up the issues" relating to identity theft or fraud.[39]

75. Plaintiffs and Class Members place significant value in data security. According to a survey conducted by the cybersecurity company FireEye Mandiant, approximately 50% of consumers consider data security a main or important consideration when making purchasing decisions, and nearly the same percentage would be willing to pay more to work with a provider with better data security. Seventy percent of consumers would provide less personal information to organizations that suffered a data breach.[40]

76. Plaintiffs and Class Members have a direct interest in TCP's promises and duties to protect PII, i.e., that TCP would not increase their risk of identity theft and fraud. Because TCP

---

[39] E. Harrell, *Victims of Identity Theft, 2014*, U.S. DEPARTMENT OF JUSTICE (Nov. 13, 2017), http://www.bjs.gov/content/pub/pdf/vit14.pdf.
[40] Richard Turner, *Beyond the Bottom Line: The Real Cost of Data Breaches*, FIREEYE (May 11, 2016), https://web.archive.org/web/20210422161745/https://www.fireeye.com/blog/executive-perspective/2016/05/beyond_the_bottomli.html.

failed to live up to its promises and duties in this respect, Plaintiffs and Class Members seek the present value of ongoing identity protection services to compensate them for the present harm and present and continuing increased risk of harm caused by TCP's wrongful conduct. Through this remedy, Plaintiffs seek to restore themselves and Class Members as close to the same position as they would have occupied but for TCP's wrongful conduct, namely its failure to adequately protect Plaintiffs' and the Class Members' PII.

77. Plaintiffs and Class Members further seek to recover the value of the unauthorized access to their PII permitted through TCP's wrongful conduct. This measure of damages is analogous to the remedies for the unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's PII is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, Plaintiffs may generally recover the reasonable use of the value of the IP—i.e., a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles, authorizing recovery of rental or use value. This measure is appropriate because: (a) Plaintiffs and Class Members have a protectible property interest in their PII; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; (c) rental value is established with reference to market value, i.e., evidence regarding the value of similar transactions.

78. Plaintiffs and Class Members have an interest in ensuring that their PII is secured and not subject to further theft, as TCP continues to hold their PII.

**E. Defendant Failed to Implement Reasonable Security Measures.**

79. Notwithstanding the foreseeable risk of a cyberattack and the well-established standards of care set forth above, Defendant failed to implement reasonable security measures sufficient to protect Plaintiffs' and Class Members' Private Information from unauthorized access.

80. The Data Breach itself is evidence that Defendant's data-security practices fell below the applicable standard of care. Upon information and belief, had Defendant implemented industry-standard measures—including, without limitation, encryption of stored Private Information, phishing-resistant multi-factor authentication, network segmentation, robust logging and monitoring systems, prompt patching of known vulnerabilities, secure backup procedures, and adequate workforce training — the unauthorized third party would have been detected and stopped before Private Information could be removed from Defendant's network.

81. Defendant's failure to detect the unauthorized access for some period of time and its lengthy delay in completing its investigation and notifying affected individuals further reflect deficient incident-response capabilities inconsistent with the standard of care set forth in NIST SP 800-61 Rev. 3 and the FTC's *Data Breach Response: A Guide for Business* (Aug. 2023).[41]

**F. Plaintiffs' Experience**

82. Plaintiffs are current or former customers of TCP who retained it to provide credit analysis and restoration services, including assistance with correcting inaccurate or disputed items on their credit reports.

83. As a condition of receiving those services, Plaintiffs were required to provide TCP with their Private Information, including name, contact information, date of birth, address, Social Security number, and financial account information. Plaintiffs did so with the reasonable

---

[41] https://www.ftc.gov/business-guidance/resources/data-breach-response-guide-business.

expectation that TCP would safeguard that information.

84. Following the Data Breach, each Plaintiff was notified that their Private Information had been found on the dark web.

85. In fact, Plaintiff Bradley was notified by a dark-web monitoring service that Private Information had been found on the dark web.

86. Plaintiff Devargas was notified through an alert from Experian that Private Information had been found on the dark web.

87. As a direct and proximate result of the Data Breach, Plaintiff Bradley has experienced a marked increase in unsolicited telephone calls, including suspected scam and phishing calls, and in unsolicited spam emails, and she has discovered accounts on her credit report that she did not open and that do not belong to her, consistent with the fraudulent misuse of her Private Information.

88. As a direct and proximate result of the Data Breach, Plaintiff Devargas has experienced a marked increase in unsolicited spam emails and has observed old collection accounts he had previously worked to resolve reappear on his credit file, which he attributes to the Data Breach.

89. Plaintiffs have spent, and will continue to spend, time and effort responding to the Data Breach, including monitoring their financial accounts, credit files, and incoming communications for indicia of identity theft, and considering and evaluating additional protective measures such as credit monitoring and the placement of fraud alerts or credit freezes. Plaintiff Bradley has also changed her account access credentials and contacted her bank in response to the Data Breach.

90. Plaintiffs have suffered, and will continue to suffer, anxiety, concern, and emotional

distress arising from the loss of control over their Private Information and from the imminent and ongoing risk that their Private Information will be used to commit identity theft or fraud against them.

91. Plaintiffs did not consent to TCP's release of their Private Information to unauthorized third parties, and neither Plaintiff would have provided his or her Private Information to TCP, or would have provided less of it, had they known of TCP's deficient cybersecurity practices.

**G. Injuries Suffered by Plaintiffs and the Class.**

92. As a direct and proximate result of the Data Breach, Plaintiffs and Class members have suffered, and will continue to suffer, injury and damages, including, but not limited to:

a) actual misuse of Plaintiffs' Private Information, including the appearance on Plaintiff Bradley's credit report of accounts she did not open, together with the exfiltration and publication of Plaintiffs' Private Information by criminal actors on the dark web

b) the unauthorized acquisition and disclosure of their Private Information by criminal third parties, and the corresponding loss of privacy and confidentiality in that information;

c) a substantial and certainly impending increased risk of identity theft, financial fraud, and other forms of misuse of their Private Information—risks that justify and require ongoing expenditures for protective and remedial services;

d) lost time, lost productivity, and out-of-pocket expenses incurred to mitigate and remediate the consequences of the Data Breach, including the costs and effort associated with monitoring credit and financial accounts, placing and lifting fraud alerts and credit freezes, and obtaining identity theft and credit monitoring services;

e) the diminished value of their Private Information, for which there is a well-documented economic market;

f) anxiety, concern, and emotional distress arising from the loss of control over their Private Information and the ongoing risk of misuse of that information;

g) a marked increase in unsolicited telephone calls, electronic messages, and other communications consistent with the misuse of their Private Information;

h) the deprivation of the benefit of the bargain in their commercial relationship with

Defendant, in that they paid Defendant for credit analysis and restoration services, and a portion of that consideration was understood to be allocated to the protection of their Private Information, a service Defendant failed adequately to provide; and

i) the continuing risk to their Private Information, which remains in Defendant's possession and continues to be subject to further unauthorized access in the absence of adequate remediation.

## CLASS ACTION ALLEGATIONS

93. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and the following proposed class (collectively, "the Class"), defined as follows:

> **Nationwide Class**
> All persons residing in the United States whose personally identifiable information was accessed by and disclosed in the Data Breach to unauthorized persons.

94. Excluded from the proposed Class are any officer or director of TCP; any officer or director of any affiliate, parent, or subsidiary of TCP; anyone employed by counsel in this action; and any judge to whom this case is assigned, his or her spouse, and members of the judge's staff.

95. **Numerosity:** Members of the proposed Class are likely to number in the hundreds of thousands and are thus too numerous to practically join in a single action. Membership in the Class is readily ascertainable from TCP's own records.

96. **Commonality and Predominance:** Common questions of law and fact exist as to the proposed Class Members and predominate over questions affecting only individual Class Members. These common questions include:

a. Whether TCP engaged in the wrongful conduct alleged herein;

b. Whether TCP's inadequate data security measures were a cause of the Data Breach;

c. Whether TCP owed a legal duty to Plaintiffs and the other Class Members to exercise due care in collecting, storing, and safeguarding their PII;

d. Whether TCP negligently or recklessly breached legal duties owed to

Plaintiffs and the Class Members to exercise due care in collecting, storing, and safeguarding their PII;

e. Whether Plaintiffs and the Class are at an increased risk for identity theft because of the Data Breach;

f. Whether TCP failed to implement and maintain reasonable security procedures and practices for Plaintiffs' and Class Members' PII;

g. Whether Plaintiffs and the other Class Members are entitled to equitable relief, including, but not limited to, injunctive relief and restitution.

97. TCP engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, individually, and on behalf of the other Class Members. Similar or identical statutory and common violations, business practices, and injuries are involved. Individual questions, if any, pale in both quantity and quality by comparison to the numerous questions that dominate this action.

98. **Typicality:** Plaintiffs' claims are typical of the claims of the Members of the Class. All Class Members were subject to the Data Breach and had their PII accessed by and/or disclosed to unauthorized third parties. TCP's misconduct affected all Class Members in the same manner.

99. **Adequacy of Representation:** Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the other Class Members they seek to represent; they have retained counsel competent and experienced in complex class action litigation, and Plaintiffs will prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

100. **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiffs and the other Class Members are relatively small compared to

the burden and expense that would be required to litigate their claims on an individual basis against TCP, making it impracticable for Class Members to individually seek redress for TCP's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation would create the potential for inconsistent or contradictory judgments, increasing delays and expenses for all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
*(On Behalf of Plaintiffs and the Class Against Defendant)*

101. Plaintiffs reallege paragraphs 1 through 100 as if fully set forth herein.

102. Plaintiffs bring this claim individually and on behalf of the Class.

103. To obtain credit analysis, credit repair, and credit restoration services, Plaintiffs and Class Members were required to provide non-public personal and financial information to TCP. Plaintiffs and Class Members are current or former customers of TCP who entrusted their sensitive PII to TCP in connection with those services. That information was collected, stored, and maintained by TCP as part of its operations, and Plaintiffs and Class Members reasonably expected TCP to safeguard their information consistent with its legal and contractual obligations.

104. By collecting, storing, sharing, and using customers' data on Defendant's computer network for commercial gain, TCP owed a duty to Plaintiffs and the Class to exercise reasonable care in obtaining, securing, safeguarding, storing, and protecting Plaintiffs' and Class Members' PII from being compromised, lost, stolen, and accessed by unauthorized persons. This duty

includes, among other things, designing, maintaining, and testing its data security systems to ensure that Plaintiffs' and Class Members' PII in Defendant's possession was adequately secured and protected.

105. Defendant owed a duty of care to Plaintiffs and Class Members to maintain data security according to industry standards and other relevant requirements. Defendant was also responsible for ensuring its systems, networks, and personnel adequately protected the Private Information.

106. Defendant's duty of care to use reasonable security measures arose from the relationship between TCP and Plaintiffs and Class Members, who entrusted their sensitive PII to TCP in connection with credit analysis and restoration services. This duty is recognized by the FTC's Safeguards Rule and by common-law principles requiring reasonable care in safeguarding confidential information. Defendant was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members resulting from a Data Breach.

107. Defendant's duty was to implement reasonable security measures to safeguard confidential data from both intentional and unintentional use or disclosure. As a financial institution, Defendant was required to develop, implement, and maintain reasonable administrative, technical, and physical safeguards to protect the security, confidentiality, and integrity of customer information, as set forth in the FTC's Safeguards Rule, 16 C.F.R. Part 314.

108. In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

109. Defendant TCP breached its duties by failing to exercise reasonable care and failing

to safeguard and protect Plaintiffs' and the other Class Members' PII.

110. It was reasonably foreseeable that TCP's failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and the other Class Members' PII would result in an unauthorized third party gaining access to such information for no lawful purpose.

111. As a direct result of TCP's breach of its duty of confidentiality and privacy and the disclosure of Plaintiffs' and Class Members' confidential information, Plaintiffs and the Class Members suffered damages, including, without limitation, loss of the benefit of the bargain, exposure to heightened future risk of identity theft, increased infiltrations into their privacy through spam and/or attempted identity theft, loss of privacy, loss of confidentiality, embarrassment, emotional distress, humiliation, and loss of enjoyment of life.

112. Neither Plaintiffs nor other Class Members contributed to the Data Breach.

113. TCP's wrongful actions and/or inaction and the resulting Data Breach constituted, and continue to constitute, negligence at common law.

114. As a result of TCP's above-described wrongful actions and inaction that directly and proximately caused the Data Breach, Plaintiffs and Class Members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft and fraud; (iii) lost time and loss of productivity responding to the Data Breach; (iv) the diminished value of their Private Information; (v) loss of privacy and confidentiality; (vi) emotional distress; and (vii) the loss of the benefit of the bargain. Plaintiffs and Class Members are entitled to compensatory and consequential damages as a result of TCP's negligence.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
*(On Behalf of Plaintiffs and the Class)*

115. Plaintiffs reallege paragraphs 1 through 100 as if fully set forth herein.

116. When Plaintiffs and Class Members provided their Private Information in

connection with obtaining credit analysis and restoration services from TCP, and TCP thereafter collected, stored, and maintained that information as part of its operations, Plaintiffs and Class Members entered into implied contracts with TCP under which TCP agreed to reasonably safeguard and protect their Private Information.

117. TCP solicited, received, accessed, stored, and processed Plaintiffs' and Class Members' Private Information as part of its regular operations, including the provision of credit analysis and restoration services. Plaintiffs and Class Members provided their Private Information to TCP with the reasonable expectation that it would be safeguarded and protected from unauthorized access.

118. In entering such implied contracts, Plaintiffs and Class Members reasonably believed and expected that TCP's data security practices complied with relevant laws and regulations, including the Gramm-Leach-Bliley Act and the FTC's Safeguards Rule, and adhered to industry standards applicable to the protection of sensitive personal and financial information.

119. Plaintiffs and Class Members paid money for credit analysis and restoration services, with the reasonable belief and expectation that a portion of those payments would be used to implement and maintain adequate data security measures. TCP failed to maintain reasonable and adequate data security.

120. Plaintiffs and Class Members would not have entrusted their Private Information to TCP in connection with obtaining its services in the absence of the implied contracts under which TCP agreed to keep such information reasonably secure.

121. Plaintiffs and Class Members would not have provided their Private Information to TCP, or permitted that information to be collected and maintained by TCP, absent TCP's implied promises to monitor its computer systems and networks and to adopt reasonable data security

measures to protect that information from unauthorized access.

122. TCP breached its implied contracts with Plaintiffs and Class Members by failing to safeguard and protect their Private Information.

123. As a direct and proximate result of Defendant's breach of the implied contracts, Plaintiffs and Class Members sustained damages as alleged herein, including the loss of the benefit of the bargain.

124. Plaintiffs and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

125. Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, inter alia: (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring and identity protection services to all Class Members.

**COUNT III**
**UNJUST ENRICHMENT**
*(On Behalf of Plaintiffs and the Nationwide Class)*

126. Plaintiffs reallege paragraphs 1 through 100 as if fully set forth herein.

127. Plaintiffs and Class Members conferred a benefit upon TCP in the form of their Private Information, which TCP collected, stored, and used in connection with credit analysis and restoration services, with the implicit understanding that TCP would adequately safeguard the PII entrusted to it. Additionally, TCP received payment for the credit analysis and restoration services provided to Plaintiffs and Class Members.

128. TCP accepted and had knowledge of the benefits conferred upon it by Plaintiffs and Class Members, including access to, use of, and reliance upon their PII in the ordinary course of its operations. TCP further benefited financially from providing its services to Plaintiffs and Class Members while retaining and utilizing their sensitive information.

129. As a result of TCP's conduct, Plaintiffs and Class Members suffered actual damages.

130. TCP should not be permitted to retain monies paid to it for credit analysis and restoration services involving Plaintiffs' and Class Members' information because TCP failed to adequately implement the data privacy and security procedures required by applicable laws and industry standards.

131. TCP should be compelled to provide, for the benefit of Plaintiffs and Class Members, all unlawful proceeds received by it as a result of the conduct and Data Breach alleged herein.

**COUNT IV**
**DECLARATORY JUDGMENT (28 U.S.C. §§ 2201, 2202)**
*(On Behalf of Plaintiffs and the Class)*

132. Plaintiffs reallege paragraphs 1 through 100 as if fully set forth herein.

133. An actual controversy has arisen between Plaintiffs and Class Members, on the one hand, and Defendant, on the other, concerning Defendant's data security obligations to safeguard the Private Information of Plaintiffs and Class Members and the adequacy of Defendant's ongoing data security practices.

134. Plaintiffs and Class Members continue to be at substantial and continuing risk of injury arising from the permanent compromise of their Social Security numbers, financial account information, and other Private Information, and they remain dependent on Defendant's ongoing data security practices to prevent further unauthorized access to or disclosure of their Private Information that may remain in Defendant's possession or in the possession of Defendant's affiliates, vendors, and service providers.

135. Defendant's ongoing data security practices have not been demonstrated to be reasonable, and Defendant continues to maintain Private Information regarding Plaintiffs and

Class Members in environments substantially similar to those that were compromised in the Data Breach.

136. Plaintiffs and Class Members seek a declaratory judgment, pursuant to 28 U.S.C. § 2201, declaring that: (a) Defendant's existing data security practices are not reasonable and do not comply with applicable legal and industry standards, including the Gramm-Leach-Bliley Act and the FTC's Safeguards Rule; (b) Defendant owes a continuing duty of care to safeguard the Private Information of Plaintiffs and Class Members; and (c) Defendant must implement and maintain reasonable administrative, technical, and physical safeguards, consistent with the Gramm-Leach-Bliley Act, the FTC's Safeguards Rule, the Federal Trade Commission Act, and current industry standards, to protect the Private Information of Plaintiffs and Class Members on an ongoing basis.

137. Plaintiffs and Class Members also seek such further necessary or proper relief based on the declaratory judgment as the Court may grant pursuant to 28 U.S.C. § 2202

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the other members of the Class proposed in this Complaint, respectfully request that the Court enter judgment in their favor and against TCP, as follows:

(a) Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiffs as Class Representatives, and appointing Plaintiffs' counsel as Lead Counsel for the Class;

(b) Awarding Plaintiffs and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

(c) Awarding Plaintiffs and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiffs, on behalf of themselves and the Class, seek appropriate injunctive relief designed to prevent TCP from experiencing another data breach by adopting and implementing best data security practices to safeguard PII and to provide or extend credit monitoring services and similar services to protect against all types of identity theft;

(d) Awarding Plaintiffs and the Class pre-judgment and post-judgment interest to

the maximum extent allowable;

(e) Awarding Plaintiffs and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

(f) Awarding Plaintiffs and the Class such other favorable relief as allowable under law.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all appropriate issues raised in this Class Action Complaint.

Dated: June 19, 2026

Respectfully submitted,

*/s/ Robert R. Jimenez*
Robert R. Jimenez (FBN 72020)
Valentina Rios Barboza (FBN 1070256)
**BRYSON HARRIS SUCIU**
**& DEMAY PLLC**
201 Sevilla Avenue, Suite 200
Miami, Florida 33134
Telephone: (786) 206-7896
rjimenez@brysonpllc.com;
vbarboza@brysonpllc.com;
lblanco@brysonpllc.com;
ajaramillo@brysonpllc.com

*Counsel for Plaintiffs and the Class*